The Hon. Tiffany M. Cartwright

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, COLUMBIA RIVERKEEPER, CONSERVATION LAW FOUNDATION, CONSERVATION NORTHWEST, FRIENDS OF THE WILD SWAN, OREGON WILD, SIERRA CLUB, SWAN VIEW COALITION, and WILDEARTH GUARDIANS,<br><br>Plaintiffs,<br><br>vs.<br><br>DOUGLAS BURGUM, Secretary of the Interior; KEVIN LILLY, Principal Deputy Assistant Secretary for Fish and Wildlife and Parks; U.S. FISH AND WILDLIFE SERVICE; HOWARD LUTNICK, Secretary of Commerce; TIMOTHY R. PETTY, Assistant Secretary of Commerce for Oceans and Atmosphere and Deputy NOAA Administrator; and NATIONAL MARINE FISHERIES SERVICE,<br><br>Defendants. | No. 2:26-cv-02474-TMC<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

Plaintiffs file this First Amended Complaint to add a claim for which they provided 60 days' notice of intent to sue pursuant to 16 U.S.C. § 1540(g) on July 14, 2026 (Exhibit A). Plaintiffs have also attached full declarations of individual members (Exhibit B) describing their interests in the protection of particular threatened and endangered species and their geographic habitat, as well as the injury and risk of injury to those members from the repeal of the regulatory definition of harm. These interests and injuries were summarized in the initial complaint. The following paragraphs of this First Amended Complaint contain amended language: 15, 17.C.i, 17.D.ii, 18. The Third Claim for Relief is newly added, as is an additional counsel.

## INTRODUCTION

1. For fifty years, common sense, biological science, and federal law have agreed on an overarching concept in the protection of fish and wildlife: any activity that destroys the habitat where imperiled fish and wildlife shelter, sleep, feed, or raise their young just as plainly destroys the species itself. When a dam blocks stream passage, threatened and endangered salmon suffer; when forests with nesting trees for marbled murrelets are logged, threatened murrelets slide closer to extinction. Destruction and degradation of habitat kills threatened and endangered species just as surely as shooting them. Now, however, Federal Defendants have arbitrarily abandoned that fundamental concept.

2. This suit challenges the Federal Defendants' rescission of the regulatory definition of "harm" in the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*—a rescission that defies the text and purpose of the statute, fifty years of administrative policy, and U.S. Supreme Court precedent.



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

3. Since 1973, the ESA has served as the nation's most effective conservation law, saving numerous imperiled species from extinction and moving them toward recovery. In the ESA, Congress affirmed our nation's commitment to the conservation of threatened and endangered species and their habitats—the forests, grasslands, prairies, rivers, lakes, and seas that these species need to survive. Both the statutory text and legislative history demonstrate Congress's understanding that habitat destruction is a chief threat to imperiled species. Congress committed the nation to countering that threat. The Act's overarching purpose is "to provide a means whereby the *ecosystems* upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b) (emphasis added).

4. As one means to accomplish this objective, the ESA prohibits the "take" of endangered and threatened wildlife, which is defined by statute to include "harm." *Id.* § 1532(19). From 1975 to 2026, the U.S. Fish & Wildlife Service ("FWS")—which jointly administers the ESA with the National Marine Fisheries Service ("NMFS")—defined "harm" by regulation to include habitat destruction. Last amended in 1981, FWS's definition of "harm" included "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. This definition reflected the scientifically proven and common-sense principle that a species can be driven to extinction by acts that destroy its habitat without the direct application of force to members of the listed species; the definition also recognized that the ESA was intended to prevent that outcome.

5. In 1995, the Supreme Court upheld FWS's definition of "harm," explaining that "an ordinary understanding of the word 'harm' supports it," "the broad purpose of the ESA supports" it, and a 1982 amendment to the Act "strongly suggests that Congress understood [the



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

Act] to prohibit indirect as well as deliberate takings." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 697–700 (1995).

6. NMFS promulgated a definition of "harm" in 1999 that substantively mirrored the FWS definition. NMFS's definition included "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102.

7. This legal protection against significant habitat destruction that kills or injures endangered wildlife has proven essential to the ESA's effectiveness at preventing the extinction of imperiled species and promoting their recovery. It ensures, for example, that the dam blocking salmon migration, the logging project that cuts down a tree for nesting owls, and the oil and gas development in Alaska that disturbs polar bears are regulated in the interest of species conservation, just as the direct killing of these species would be. In practice, including such activities within the ESA's regulatory ambit means that species are not driven to extinction by "take" that is incidental to a commercial or industrial project's execution. At the same time, the Act provides a reasonable pathway for such projects to proceed if they "minimize and mitigate" their impacts and do "not appreciably reduce the likelihood of the survival and recovery of the species in the wild." 16 U.S.C. §§ 1536(b)(4), 1539(a)(2)(B).

8. On July 10, 2026, FWS and NMFS (collectively, the "Services") signed the repeal of their respective regulatory definitions of "harm," with publication in the Federal Register on July 14, 2026. *See* Rescinding the Definition of "Harm" Under the Endangered Species Act, 91 Fed. Reg. 43300 (July 14, 2026) ("Rescission"). Defying clear congressional intent and Supreme Court precedent, the Services claimed that the Rescission was compelled because their



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

regulatory definitions did not represent the "best reading" of the statute. *Id.* at 43301. They sought to justify their action under the Supreme Court's recent ruling in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), which affirmed the judiciary's central role in statutory interpretation. Yet they disregarded *Loper Bright*'s affirmance of statutory *stare decisis* principles, and more fundamentally, advanced an Executive Branch interpretation of statutory terminology based on "individual policy preferences"—the very sort of interpretation that *Loper Bright* rejected. *Id.* at 403.

9. Far from reflecting a "judgment of the Judiciary," as *Loper Bright* prescribes, *id.* at 386, the Services' proffered statutory interpretation underlying the Rescission adopted the *dissenting view* from the Supreme Court's *Sweet Home* decision as the law of the land. Under this view, the term "harm" in the ESA's definition of "take" applies only to an affirmative action "directed immediately and intentionally against a particular animal"—e.g., wounding, trapping, or killing. *Sweet Home*, 515 U.S. at 720 (Scalia, J., dissenting). Yet the *Sweet Home* majority rejected the dissent's limited reading on the basis of the language, structure, and legislative history of the ESA. *See id.* at 696–708. Contrary to any logical reasoning, the Services' Rescission—adopted as the "single, best meaning of the statute," 91 Fed. Reg. at 43301—is the interpretation already rejected by a majority of justices of the U.S. Supreme Court.

10. In their Rescission, the Services did not promulgate a new regulatory definition of "harm," instead asserting, "Given that 'take' is defined in the statute, and that the role and meaning of the term 'harm' within the larger definition of 'take' was expertly explicated by Justice Scalia in his *Sweet Home* dissent— an interpretation which we have herein adopted—we find that maintaining a freestanding definition of 'harm' is unnecessary." *Id.* at 43302. But even



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

in the absence of a replacement definition, the Services intended to "mak[e] clear that habitat modification or degradation does not qualify as 'take.'" *Id.* at 43306.

11. The Rescission discards a longstanding and critical regulatory protection for imperiled wildlife based upon an irrational and unsupported interpretation of the ESA that would undermine the Act's extraordinary record of success in preventing the extinction of and recovering threatened and endangered species. The Rescission violates the plain language and overarching purpose of the ESA; it also lacks any reasoned basis and is arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*.

12. Additionally, the Services failed to consider and disclose the significant environmental impacts from the Rescission in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* The Rescission is not compelled by statute, nor is it "nondiscretionary," 91 Fed. Reg. at 43307, and it will have significant impacts on the human environment. The Rescission also raises extraordinary circumstances, barring the use of a categorical exclusion to avoid NEPA analysis, contrary to the Services' explanation. *See id.* at 43306–07.

13. The Services also violated ESA Section 7, 16 U.S.C. § 1536, by failing to engage in consultation regarding the impacts of the Rescission on imperiled species and their critical habitat—an essential step that the ESA mandates to ensure that federal agencies avoid actions that are likely to jeopardize listed species or impair the habitat they need for survival and recovery.

14. To remedy these violations of law, Plaintiffs seek an order from this Court declaring the Rescission invalid, vacating the Rescission, prohibiting reliance on the Rescission,



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

and reinstating the regulatory definitions of "harm" that guided the Services' administration of the ESA for over fifty years.

JURISDICTION AND VENUE

15. This action is brought pursuant to the APA, 5 U.S.C. §§ 701–706, and the ESA, 16 U.S.C. § 1540(g)(1), which waive the Federal Defendants' sovereign immunity. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question). Pursuant to 16 U.S.C. § 1540(g)(2), Plaintiffs provided 60 days' notice of intent to sue to the Services for failure to consult on the Rescission in violation of ESA Section 7(a)(2) on July 14, 2026. A copy of the notice letter is appended as Exhibit A.

16. Venue is properly vested in this Court under 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3), as at least one of Plaintiffs is headquartered in this district, Plaintiffs have members and offices in this district, and many of the consequences of the Federal Defendants' violations of the law giving rise to Plaintiffs' claims occur or will occur in this district.

PARTIES

17. Plaintiffs in this action are:

A. CENTER FOR BIOLOGICAL DIVERSITY ("Center"), a non-profit environmental organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center is incorporated in California and headquartered in Tucson, Arizona, with field offices throughout the United States and Mexico, including in Seattle, Washington. The Center's mission is tied to the belief that the welfare of human beings is deeply linked to nature—to the existence in our world of a vast diversity of wild animals and plants. Because diversity has intrinsic value, and because its loss impoverishes society, the Center works to secure a future for all species, great and small, hovering on the brink



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

of extinction, using science, law, and creative media, with a focus on protecting the lands, waters, and climate that species need to survive.

i. The Center and its members are concerned with the conservation of imperiled species, including ones that will be affected by repeal of the harm regulations, and with the effective implementation of the ESA. The Center has over 93,000 members, including over 3,000 members in Washington. The Center's members derive recreational, professional, commercial, scientific, educational, and aesthetic benefits from their interactions with threatened and endangered species and their habitat across the United States, and they are harmed by the repeal of the regulatory definition of harm by Federal Defendants. The Center submitted comments on the proposed repeal of the harm rule.

ii. The Center's individual members, including members Noah Greenwald and Betsy Norton, have visited, studied, worked, and recreated on lands that are home to threatened and endangered species, and they have specific intentions to continue to do so frequently and on an ongoing basis. Mr. Greenwald's recreational and professional interests include the Habitat Conservation Plan being developed for western Oregon's state forests, home to seventeen endangered and threatened species. The amount of take that must be mitigated, according to the draft Western Oregon State Forests Habitat Conservation Plan, is largely based on the expected loss and modification of habitat. For some species, like Oregon Coast coho salmon, loss and detrimental modification of habitat is the primary means of take—take that the Services no longer acknowledge with the repeal of the harm definition. Ms. Norton has specific interest in protected species and habitat that are currently being addressed through development of a Habitat Conservation Plan in Bush Prairie, Olympia, Washington. The Bush Prairie Habitat Conservation Plan aims to protect habitat for the Olympia pocket gopher, streaked horned lark,



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

Oregon vesper sparrow, and Oregon spotted frog—all species that bring Ms. Norton great enjoyment as she regularly hikes and birds in the area. The rescission of the harm rule—and failure to consider habitat degradation and modification to constitute take—will adversely impact Mr. Greenwald and Ms. Norton's interests in these habitats and species.

B. COLUMBIA RIVERKEEPER, a non-profit organization with principal places of business in Hood River and Portland, Oregon. Columbia Riverkeeper's overarching mission is to protect and restore the water quality of the Columbia River and all life connected to it, from the headwaters to the Pacific Ocean. With respect to salmon recovery, Columbia Riverkeeper's long-term goal is abundant and harvestable populations of wild salmon. In the mid-term, Columbia Riverkeeper's goal is clean and free-flowing rivers that facilitate salmon recovery and sustainable fisheries. Columbia Riverkeeper values the intrinsic right of salmon to survive, their value to the Pacific Northwest ecosystem and economy, and their role in helping to fulfill America's treaty promises to Tribal Nations.

i. Columbia Riverkeeper pursues its mission and these goals in order to protect its over 20,000 members' abilities to live, work, recreate, and fish for salmon near or in their communities, properties, and the Columbia and Snake Rivers. Columbia Riverkeeper pursues its mission and goals by combining strong citizen involvement, grassroots organizing, a science-based approach to conservation and environmental protection, strategic communications, and a determination to enforce key environmental laws. Its members derive recreational, professional, commercial, scientific, educational, and aesthetic benefits from their interactions with threatened and endangered species and their critical habitat, and they are harmed by the repeal of the regulatory definition of harm by Federal Defendants. Columbia Riverkeeper submitted comments on the proposed repeal of the harm rule.



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

ii. Columbia Riverkeeper's individual members, including members Miles Johnson and Cathryn Tortorici, have visited, studied, worked, and recreated on lands that are home to threatened and endangered species, and they have specific intentions to continue to do so frequently and on an ongoing basis. Mr. Johnson has personal and professional interests in Columbia Basin threatened and endangered salmon, specifically with regard to their river and aquatic habitat that is harmed by the operation of federal dams on the Snake River. Ms. Tortorici, a former federal biologist with NMFS, has a personal and professional interest in recovery of Pacific Northwest threatened and endangered salmon and steelhead in the Columbia and Willamette Rivers. These interests are harmed by the repeal of the regulatory definition of harm.

C. CONSERVATION LAW FOUNDATION ("CLF"), a nonprofit regional conservation organization based in Boston, Massachusetts, with offices in each New England state. CLF protects New England's environment for the benefit of all people, using the law, science, and the market to create solutions that preserve natural resources, build healthy communities, and sustain a vibrant economy.

i. CLF pursues its mission to protect its over 8,000 members' abilities to live, work, and recreate in a thriving New England. CLF stands up for the rule of law, sound science, thoughtful analysis, intellectual honesty, and ethical action. CLF's members derive recreational, professional, commercial, scientific, educational, and aesthetic benefits from their interactions with threatened and endangered species and their critical habitat, and they are harmed by the repeal of the regulatory definition of harm by Federal Defendants. CLF submitted comments on the proposed repeal of the harm rule.

ii. CLF's individual members, including members Brett Ciccotelli and Dwayne Shaw, have visited, studied, worked, and recreated on lands that are home to threatened and



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

endangered species, and they have specific intentions to continue to do so frequently and on an ongoing basis. Mr. Ciccotelli works on Atlantic salmon habitat restoration projects, including work to secure removal of the Branch Lake Stream dam on the Union River. Mr. Shaw is the executive director of the Downeast Salmon Federation. In his personal and professional life, he has spent decades improving salmon habitat and plans to continue this conservation work to help the species recover. Both Mr. Ciccotelli and Mr. Shaw are particularly concerned about the ongoing relicensing of the Ellsworth Hydroelectric project along the Union River, which currently delays and blocks access to Atlantic salmon spawning and rearing habitat. The repeal of the harm rule will affect these interests in the relicensing if the federal agencies administering the relicensing process no longer consider habitat degradation and modification to constitute take.

D. CONSERVATION NORTHWEST ("CNW"), a non-profit regional conservation organization based in Seattle, Washington, with an office in Twisp and staff in Bellingham, Chewelah, Ellensburg, Okanogan, Olympia, Omak, Onalaska, and Spokane, Washington. CNW focuses on conservation and restoration of wildlands and wildlife in the Pacific Northwest and British Columbia, Canada. The organization is recognized as a regional leader in wildlife conservation, with a strong record of advocating for science-based conservation policy. CNW's mission is to protect and connect habitat and restore imperiled wildlife from the Pacific Coast to the Canadian Rockies.

i. CNW has over 17,000 members and supporters and engages in science-based advocacy through collaboration on projects that protect wildlife habitat and restore forest and watershed ecological resilience. CNW is an active voice strongly advocating for imperiled species such as the northern spotted owl, marbled murrelet, Canada lynx, grizzly bear, gray wolf,



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

wolverine, Pacific fisher, Columbia basin sage grouse, Columbia basin pygmy rabbit, and woodland caribou. CNW's members derive recreational, professional, commercial, scientific, educational, and aesthetic benefits from their interactions with threatened and endangered species and their critical habitat in the Pacific Northwest United States and western Canada, and they are harmed by the repeal of the regulatory definition of harm by Federal Defendants. CNW submitted comments on the proposed repeal of the harm rule.

ii. CNW's individual members, including members David Werntz, David Moskowitz, and Joe Scott, have visited, studied, worked, and recreated on lands that are home to threatened and endangered species, and they have specific intentions to continue to do so frequently and on an ongoing basis. Mr. Werntz's personal and professional passion is conserving imperiled wildlife, including the northern spotted owl and its habitat in Washington. He has been actively involved in national forest planning and amendments, including the Northwest Forest Plan. Ongoing work by the U.S. Forest Service to amend the Northwest Forest Plan should address take of threatened northern spotted owls and other wildlife due to habitat destruction and degradation, but the Rescission threatens to undermine that process. Mr. Werntz's personal and professional interests include advocating for strong protections for remaining mature and old-growth forests in the Pacific Northwest, which are essential habitat for threatened northern spotted owls. The presence of the northern spotted owl and northern spotted owl habitat in the areas where Mr. Werntz hikes and visits has been a source of great enjoyment and is one of the reasons he chooses to recreate in those areas. Mr. Moskowitz's personal and professional interests center on wildlife photography, biology, tracking, and education. He is the photographer and author of three books: Caribou Rainforest, Wildlife of the Pacific Northwest, and Wolves in the Land of Salmon, co-author and photographer of Peterson's Field



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

Guide to North American Bird Nests and photographer of Big River: Resilience and Renewal in the Columbia Basin. Mr. Moskowitz helped establish the Cascades Wolverine Project, a grassroots effort to support wolverine recovery in the North Cascades using field science, visual storytelling, and building backcountry community science. Mr. Moskowitz's economic and professional interests in threatened and endangered species such as Wolverine, Canada lynx, White-tailed ptarmigan, and Mountain caribou are compromised by the Rescission and the loss of habitat protection for these species. Mr. Scott is also a member and staff member whose personal and professional focus is on restoring grizzly bears to their former habitat in the North Cascades in Washington. Mr. Scott hikes and camps in the habitat of many other threatened and endangered species in the North Cascades and other federal and state forests in Washington every year and has definite plans to continue to recreate in this habitat in the future.

E. FRIENDS OF THE WILD SWAN ("Friends"), a Montana non-profit environmental organization that works to protect and restore fish and wildlife habitat on public lands in the Swan and Flathead River drainages. Friends' goals are to protect and improve water quality for people and native fish, maintain and recruit old-growth forest habitat to ensure the viability of old-growth dependent birds and wildlife, and improve fish and wildlife habitat security by reducing road densities on public lands.

i. Friends pursues its mission on behalf of its approximately 350 members and supporters to protect their ability to live, work, and recreate in proximity to imperiled species and their habitat in the Swan and Flathead River drainages. Friends' members derive recreational, professional, commercial, scientific, educational, and aesthetic benefits from their interactions with threatened and endangered species and their critical habitat, and they are harmed by the



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

repeal of the regulatory definition of harm by Federal Defendants. Friends of the Wild Swan submitted comments on the proposed repeal of the harm rule.

ii. Friends' individual members, including member Arlene Montgomery, have visited, studied, worked, and recreated on lands that are home to threatened and endangered species, particularly grizzly bears and bull trout, and they have specific intentions to continue to do so frequently and on an ongoing basis. Ms. Montgomery has lived in Swan Valley for thirty-four years and is able to recreate in the forests near her home easily and in all seasons. Ms. Montgomery has long worked to reduce road densities within grizzly bear habitat, and federal agencies have in the past used road density management standards as a surrogate for measuring impacts that cause prohibited take. Pending Forest Service management actions and mitigation of take caused by those actions in the Flathead National Forest hinge on the longstanding definition of harm as including harm to habitat, and the repeal of the harm rule threatens to undermine current protective standards and allow more roads in grizzly and bull trout habitat.

F. OREGON WILD, a nonprofit organization headquartered in Portland, Oregon, with satellite offices in Eugene, Bend, and Enterprise, Oregon. Oregon Wild's mission is to protect and restore Pacific Northwest wildlands, wildlife, and waters—particularly in Oregon—as an enduring legacy for future generations. Oregon Wild's members hike, recreate, bird watch, and appreciate nature throughout the Pacific Northwest, and the organization and its members have a long history of advocating for federal protections for threatened and endangered species and the habitat they need to survive. In fact, Oregon Wild was an amicus curiae (under the name Oregon Natural Resources Council) in the U.S. Supreme Court case *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, where the Supreme Court upheld the definition of harm that Federal Defendants have now rescinded.



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

i. Oregon Wild and its over 20,000 members and supporters are concerned with the conservation of imperiled species, including species that will be affected by repeal of the harm definition. Oregon Wild's members derive recreational, professional, commercial, scientific, educational, and aesthetic benefits from their interactions with threatened and endangered species and their habitat across the Pacific Northwest, and they are harmed by the repeal of the regulatory definition of harm by Federal Defendants. Oregon Wild submitted comments on the proposed repeal of the harm rule.

ii. Oregon Wild's individual members, including members Doug Heiken and Bob Van Dyk, have visited, studied, worked, and recreated on lands that are home to threatened and endangered species, and they have specific intentions to continue to do so frequently and on an ongoing basis. Mr. Heiken's personal and professional interests include advocating for strong protections for remaining mature and old-growth forests in the Pacific Northwest, which are essential habitat for threatened northern spotted owls. Mr. Heiken regularly visits public lands in Oregon that contain remaining habitat for northern spotted owls and marbled murrelets. Ongoing work by the U.S. Forest Service to amend the Northwest Forest Plan, as well as anticipated changes to the Resource Management Plans for Bureau of Land Management forests in Oregon, will address take of threatened northern spotted owls and other wildlife due to habitat destruction and degradation. Mr. Van Dyk is an avid angler and often hikes and fishes in streams near his home. He has worked on protection of salmon and steelhead habitat from degradation from commercial logging, and he helped spearhead the Private Forest Accord, legislation that amended the Oregon Forest Practices Act with an aim to avoid and minimize the effects of logging on a number of aquatic species, while also providing certainty to landowners through a federal Habitat Conservation Plan. The resulting agreement assumes that degrading salmon and



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

trout habitat can amount to take under the ESA, a foundational concept undermined by Federal Defendants' repeal of the regulatory definition of harm.

G. SIERRA CLUB, one of the oldest environmental organizations in the United States. Sierra Club is incorporated in the State of California as a Nonprofit Public Benefit Corporation with headquarters in Oakland, California and offices in many states, including an office in Seattle, Washington. Sierra Club is dedicated to protecting and preserving the natural and human environment, and its purpose is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments. Its mission includes engaging its members and the public to protect public lands, wildlife habitat, and wildlife, and it has been a longtime, active public advocate for imperiled wildlife. Sierra Club was also an amicus curiae in *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*.

i. Sierra Club pursues its mission on behalf of its members and supporters nationwide to protect their ability to live, work, and recreate in and around imperiled species and their habitat. The organization has approximately 595,000 members nationwide, including about 22,993 members in the state of Washington. Sierra Club members derive recreational, professional, commercial, scientific, educational, and aesthetic benefits from their interactions with threatened and endangered species and their critical habitat across the United States, and they are harmed by the repeal of the regulatory definition of harm by Federal Defendants. Sierra Club submitted comments on the proposed repeal of the harm rule.

ii. Sierra Club's individual members, including members Bill Arthur and Dan Ritzman, have visited, studied, worked, and recreated on lands that are home to threatened and



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

endangered species, and they have specific intentions to continue to do so frequently and on an ongoing basis. Mr. Arthur is an avid angler, and he has fished Pacific Northwest rivers for decades. Mr. Arthur has also regularly visited national forests throughout Washington, Oregon, and Northern California. The Forest Service is currently amending the Northwest Forest Plan, and Mr. Arthur is concerned that due to the Rescission, consultations for the ongoing proposed Northwest Forest Plan amendment and activities under the forest management plans will fail to treat impacts to listed species caused by habitat modification as incidental take. Mr. Ritzman is also a long-time Sierra Club member whose personal and professional interests (as both a conservation advocate and an Arctic guide) include efforts to protect the Arctic National Wildlife Refuge and its Coastal Plain from oil and gas development. The repeal of the regulatory definition of harm risks undermining federal consultations for oil and gas activities that affect polar bears, spectacled eiders, and Steller's eiders by allowing degradation of their habitat.

H. SWAN VIEW COALITION ("Coalition"), a Montana nonprofit organization dedicated to pulling people together to conserve the community, quiet, recreation, water quality, fish, and wildlife of the Swan Valley Range. The Coalition advocates to improve environmental protections for wildlife, including grizzly bears and bull trout, in connection with federal actions affecting the Flathead National Forest, through submitting comments and legally challenging federal actions that harm wildlife and their habitat.

i. The Coalition pursues its mission on behalf of its approximately 500 members and supporters to protect their ability to live, work, and recreate in proximity to imperiled species and their habitat. Coalition members derive recreational, professional, commercial, scientific, educational, and aesthetic benefits from their interactions with threatened and endangered species and their critical habitat, and they are harmed by the repeal of the regulatory definition of



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

harm by Federal Defendants. The Coalition submitted comments on the proposed repeal of the harm rule.

ii. The Coalition's individual members, including Keith Hammer, have visited, studied, worked, and recreated on lands that are home to threatened and endangered species, and they have specific intentions to continue to do so frequently and on an ongoing basis. Mr. Hammer lives near the border of the Flathead National Forest, and he has a strong interest in conservation of grizzly bears and bull trout in the forest. On hikes, Mr. Hammer seeks to view grizzly bears and signs of bear activity. He often sees these signs while helping maintain hiking trails through Swan View Coalition's volunteer agreement with the Flathead National Forest. Mr. Hammer's advocacy to protect his interests by reducing road densities in grizzly and bull trout habitat—work that depends on recognizing how habitat harm results in harm to individual bears and fish—is threatened by Federal Defendants' repeal of the harm definition.

I. WILDEARTH GUARDIANS ("Guardians"), a non-profit environmental organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Guardians is incorporated in New Mexico and headquartered in Santa Fe, New Mexico, with additional offices in Denver, Colorado; Missoula, Montana; Portland, Oregon; and Tucson, Arizona. Guardians and its members are concerned about protecting threatened and endangered species from extinction and extensively rely upon the ESA to ensure imperiled species receive the protections they need to survive and recover.

i. Guardians pursues its mission on behalf of its approximately 210,000 members and supporters nationwide to protect their ability to live, work, and recreate in and around imperiled species and their habitat. Guardians' members derive recreational, professional, commercial, scientific, educational, and aesthetic benefits from their interactions with threatened



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

and endangered species and their critical habitat across the United States, and they are harmed by the repeal of the regulatory definition of harm by Federal Defendants. Guardians submitted comments on the proposed repeal of the harm rule.

ii. Guardians' individual members, including members Sean Stevens and Daniel Timmons, have visited, studied, worked, and recreated on lands that are home to threatened and endangered species, and they have specific intentions to continue to do so frequently and on an ongoing basis. Mr. Stevens has invested his personal and professional time and energy into making sure threatened and endangered species have a viable path to recovery by keeping their habitats healthy and connected. For decades, the Federal Defendants' definition of harm as including significant habitat modification or degradation has been a tool to protect imperiled salmon populations, marbled murrelets, and northern spotted owls in the Pacific Northwest. The pending Western Oregon State Forests Habitat Conservation Plan depends on its ability to protect listed species by preventing significant habitat modification and degradation. Mr. Timmons's personal and professional interests include protecting water flows within headwater streams in the Colorado River system, including flows that serve as habitat for cutthroat trout, and in the Rio Grande, ensuring connected river habitat. If FWS does not consider such habitat degradation and modification to constitute take, it may not require pending management plans and biological opinions to mitigate harm to the endangered silvery minnow and other species caused by the drying of the Rio Grande, resulting in an ineffective consultation process that allows the silvery minnow to dry out into oblivion.

18. Plaintiff groups and their members derive recreational, scientific, professional, commercial, and aesthetic benefits from threatened and endangered species and their habitat. Plaintiffs have members who reside near, visit, or otherwise use and enjoy threatened and



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

endangered species and their habitat in a variety of ways, including wildlife viewing, education, recreation, and aesthetic purposes. Plaintiffs have members who reside, work, travel, and recreate in places where imperiled animals and their habitat are found, along with federal and non-federal land, facilities, and activities requiring federal permits and licenses subject to the ESA's Section 7 (biological opinions and incidental take statements) and Section 10 (habitat conservation plans and incidental take permits) requirements. Individual member declarations are attached as Exhibit B.

19. Plaintiffs have a concrete interest in the Services' lawful implementation of the ESA and its role in preventing harm to and promoting recovery of imperiled wildlife; the regulatory repeal challenged in this lawsuit fundamentally undermines and contradicts the requirements of the ESA. The ESA expressly declares that endangered and threatened "species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). The decision to eliminate the ESA harm definition will cause severe adverse impacts to ecosystems throughout the nation. The known harms that would result from this loss of biological diversity are enormous, not to mention the loss of the "*unknown* uses that endangered species might have and . . . the *unforeseeable* place such creatures may have in the chain of life on this planet." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 178–79 (1978) (the value of this genetic heritage is "quite literally, incalculable").

20. Plaintiffs' aesthetic, conservation, economic, recreational, scientific, and educational interests have been, are being, and, unless their requested relief is granted, will continue to be adversely and irreparably injured by Federal Defendants' repeal of the harm definition. These are actual, concrete injuries, traceable to Federal Defendants' conduct, that



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

would be redressed by the requested relief of invalidating the Rescission and reinstating the harm rule. Plaintiffs have no adequate remedy at law.

21. Federal Defendants in this action are:

A. DOUGLAS BURGUM, U.S. Secretary of the Interior, in his professional capacity. Mr. Burgum has responsibility for implementing and fulfilling the duties of the United States Department of the Interior, including administering the ESA with regard to threatened and endangered terrestrial and freshwater plant and animal species;

B. KEVIN LILLY, Principal Deputy Assistant Secretary for Fish and Wildlife and Parks, in his professional capacity. Mr. Lilly signed the Rescission on July 10, 2026;

C. U.S. FISH AND WILDLIFE SERVICE, an agency within the U.S. Department of the Interior, charged with administering the ESA with respect to threatened and endangered terrestrial and freshwater plant and animal species;

D. HOWARD LUTNICK, U.S. Secretary of Commerce, in his professional capacity. Mr. Lutnick has responsibility for implementing and fulfilling the duties of the United States Department of Commerce, including administering the ESA with regard to threatened and endangered marine species and anadromous fish species;

E. TIMOTHY R. PETTY, Assistant Secretary of Commerce for Oceans and Atmosphere and Deputy NOAA Administrator, in his professional capacity. Mr. Petty signed the Rescission on July 10, 2026; and

F. NATIONAL MARINE FISHERIES SERVICE, an agency within the U.S. Department of Commerce, responsible for administering the ESA with respect to threatened and endangered marine species and anadromous fish species.



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

## BACKGROUND

## I. THE IMPORTANCE OF HABITAT TO THE SURVIVAL AND RECOVERY OF IMPERILED SPECIES

22. Habitat loss is the driving force behind the mounting threat of species extinction. In a recent analysis of 20,784 species on the International Union for Conservation of Nature's "Red" List of most imperiled global species, scientists found that nearly nine out of every ten species were affected by habitat destruction. For more than 70 percent of those species, habitat destruction was the primary factor threatening their continued existence.

23. The ESA's decades-old regulatory definition of "harm" reflected an overwhelming body of scientific evidence demonstrating that loss of habitat imperils species in multiple ways. Habitat loss can disrupt essential biological functions such as breeding, feeding, and sheltering. Habitat loss, including fragmentation and degradation, disturbs imperiled species in their day-to-day movements, such as foraging and migration. Without sufficient habitat, juveniles may be less successful in dispersal from their natal territories, and adults may be less successful dispersing across the landscape to find new breeding sites. Significant habitat loss threatens to impede the recovery of imperiled species and even doom them to extinction.

24. Many examples illustrate the direct connection between habitat loss and the survival of members of ESA-listed species. Pacific Northwest salmon and steelhead populations have been unable to spawn, rear, and migrate due to the reduction of river flows and construction of dams. Grizzly bears have produced fewer cubs due to displacement and habitat fragmentation from the proliferation of access roads and trails in their habitat. *Rufa* red knot shorebirds have found insufficient food during migratory stopovers due to overexploitation of horseshoe crabs on



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

the Atlantic Coast, impairing their ability to complete their lengthy migratory journeys from Tierra del Fuego to the Canadian Arctic.

II. THE ENDANGERED SPECIES ACT

25. In 1973, recognizing that various species had gone extinct or had been "so depleted in numbers that they are in danger of or threatened with extinction," Congress passed the Endangered Species Act. 16 U.S.C. § 1531(a)(1)–(2). One of the chief purposes of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." *Id.* at § 1531(b). Since its enactment more than fifty years ago, the ESA has remained "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth.*, 437 U.S. at 180.

26. To afford a species the protections of the ESA, the Secretary of the Interior or the Secretary of Commerce, acting through the Services, must first list the species as either "endangered" or "threatened" under Section 4 of the statute. *See* 16 U.S.C. § 1533. A species is "endangered" when it "is in danger of extinction throughout all or a significant portion of its range," *id.* § 1532(6), while a species is "threatened" when it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," *id.* § 1532(20); *see also id.* § 1533(c).

27. The ESA generally prohibits the "take" of listed species. *Id.* § 1538(a)(1)(B), 50 C.F.R. § 17.21(c) (endangered species); 16 U.S.C. § 1533(d), 50 C.F.R. § 17.31(a) (threatened species). To "take" a listed species means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" it, "or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

Congress intended this prohibition to be interpreted broadly to include "every conceivable way in which a person can 'take' wildlife." S. Rep. No. 93-307, at 7 (1973).

28. The word "harm" in this "take" prohibition encompasses substantial impacts from habitat modification or degradation. *See Sweet Home*, 515 U.S. at 696–708 (upholding "harm" definition that included significant habitat degradation).

29. Notwithstanding this prohibition, the Services may issue permits for the take of listed species to non-federal applicants under ESA Section 10 "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). These "incidental take permits" cannot be issued unless the applicant has submitted a "conservation plan" to the Services that specifies, among other things, the impact of the anticipated taking, the planned steps to minimize and mitigate those impacts, the available funding to take those steps, and the alternatives to the taking that were considered by the applicant. *Id.* § 1539(a)(2)(A).

30. The Services may issue an ESA Section 10 incidental take permit only if they find that the applicant will minimize and mitigate the impacts of the incidental take "to the maximum extent practicable"; that there is adequate funding for the habitat conservation plan; and that the taking "will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." *Id.* § 1539(a)(2)(B).

31. Applying these provisions, the Services have issued hundreds of incidental take permits since Congress created the incidental take permit program in 1982. These permits enable activities by private entities or individuals to go forward while balancing the survival needs of imperiled species.



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

32. While Section 10 regulates actions of non-federal entities, Section 7(a)(2) ensures that actions taken by federal agencies comport with the ESA's purpose to conserve endangered and threatened species. *See id.* § 1536(a)(2). The Section 7 regulatory process also relies on the ESA take prohibition to ensure adequate protection for endangered and threatened species. Section 7(a)(2) requires each federal agency, in consultation with NMFS or FWS (depending on the species involved), to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of any designated critical habitat. *Id.*

33. Agency "action" under this provision broadly includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas." 50 C.F.R. § 402.02. Such actions include "the promulgation of regulations" and "the granting of licenses" and "permits," as well as "actions directly or indirectly causing modifications to the land, water, or air." *Id.*

34. "Jeopardize the continued existence of" is defined as engaging in an action that "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.*

35. "Destruction or adverse modification" is defined as "a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species." *Id.*

36. To implement Section 7(a)(2), each federal action agency must determine whether its actions "may affect" any endangered or threatened species or designated critical habitat. *Id.*



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

§ 402.14(a). If the action agency determines that its proposed action is "not likely to adversely affect" any listed species or critical habitat, NMFS and/or FWS, the consulting agencies, must concur in that determination in writing. *See id.* § 402.13(c). If the consulting agency does not concur—or if the action agency determines in the first instance that its proposed action is "likely to adversely affect" listed species or critical habitat—the action agency must formally consult with one or both of the consulting agencies to ensure it does not violate the Section 7(a)(2) prohibition on "jeopardy" and "destruction or adverse modification." *Id.* § 402.14(a), (b)(1).

37. The result of the ESA Section 7(a)(2) formal consultation is the preparation by the consulting agency of a "Biological Opinion" that describes the proposed action's expected impact on listed species and critical habitat and the consulting agency's opinion on whether the action is "[l]ikely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(1)(iii), (iv)(A). In fulfilling the requirements of Section 7(a)(2), each agency must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

38. Section 7 also establishes a process for authorizing federal actions that will incidentally take—but not jeopardize the continued existence of—ESA-listed species. For such actions, the consulting agency must provide the action agency with a statement that specifies the expected impact of such taking and prescribes reasonable and prudent measures to minimize such impact and terms and conditions to implement such measures. *Id.* § 1536(b)(4). Any incidental taking that complies with the terms and conditions of the incidental take statement is not prohibited by the ESA. *Id.* § 1536(o)(2).

39. No provision of law exempts the Services themselves from the Section 7(a)(2) consultation requirement. Rather, where the action agency and the consulting agency are the



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

same, as here, the agency must engage in internal or intra-agency consultation. *See* U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook* 1-5 to 1-6, App'x E (1998).

III. THE NATIONAL ENVIRONMENTAL POLICY ACT

40. Congress enacted NEPA to "encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. Congress affirmed "the continuing responsibility of the Federal Government to use all practicable means" to, among other things, "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations" and "preserve important historic, cultural, and natural aspects of our national heritage." *Id.* § 4331(b)(1), (4).

41. To accomplish Congress's goals, NEPA imposes a "look before you leap" mandate. NEPA generally requires every federal agency, including the Services, to consider fully and disclose in a "detailed statement" the environmental consequences of their proposed actions and to evaluate a reasonable range of alternate ways to accomplish their goals before they make the decision whether to proceed with a given action. *Id.* § 4332(2)(C). An agency must prepare such a statement, known as an environmental impact statement ("EIS"), for every "proposed agency action . . . that has a reasonably foreseeable significant effect on the quality of the human environment." *Id.* § 4336(b)(1).

42. An agency must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in [its] environmental document," *id.* § 4332(2)(D), and must "make use of reliable data and resources." *Id.* § 4332(2)(E).



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

43. The purpose of an EIS is to inform the decision-makers and the public of the significant environmental impacts of the proposed action, including means to mitigate those impacts, and reasonable alternatives that will have lesser adverse environmental effects. *See id.* § 4332(2)(C); *see also Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 177 (2025). In this way, "NEPA helps agencies to make better decisions and to ensure good project management." 605 U.S. at 177.

44. Where an agency finds that its actions are not likely to have significant effects, or if the significance of the effects is unknown, it generally must prepare a more streamlined environmental assessment ("EA") of its actions. 42 U.S.C. § 4336(b)(2). The EA must "set forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary." *Id.*

45. An agency can dispense with preparing an EIS or EA only if it finds that the proposed agency action fits within a duly adopted categorical exclusion or if it is excluded from environmental review by another provision of law. *See id.* § 4336(a)(2), (b)(2).

46. A categorical exclusion is "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment within the meaning of [42 U.S.C.] section 4332(2)(C)." *Id.* § 4336e(1). Actions are ineligible for a categorical exclusion if they meet any of the "extraordinary circumstances" exemption criteria. 43 C.F.R. § 46.215. Extraordinary circumstances include actions that have "significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands; floodplains; national monuments; migratory birds; and other ecologically significant or critical areas";



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

"highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks"; "precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects"; or "significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species." *Id.* § 46.215(b), (c), (d), (g); *see also* Nat'l Oceanic & Atmospheric Admin., *Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities* at 9 (2025) ("NOAA NEPA Guidance") (listing similar examples of extraordinary circumstances).

## IV. HISTORY OF THE "HARM" DEFINITION

47. The regulation of "take" is a key component of the species' protection programs established by both Section 9 and Section 7 of the ESA. For over fifty years, such regulation has encompassed habitat modification that poses significant adverse consequences for endangered and threatened wildlife. Indeed, the inclusion of habitat destruction in the regulatory definition of "harm," as a form of "take," reflects the unwavering statutory interpretation of the past nine presidential administrations (five Republican and four Democratic). Until now, no administration has issued a contrary interpretation.

48. FWS first promulgated a definition of "harm" in 1975 that included "significant environmental modification or degradation" that "significantly disrupt[s] essential behavioral patterns" for imperiled species. 40 Fed. Reg. 44412, 44416 (Sept. 26, 1975). In 1981, FWS clarified that such habitat destruction must "actually kill[] or injure[] wildlife" to qualify as "harm," and that definition remained in place until the Rescission. *See* 46 Fed. Reg. 54748, 54750 (Nov. 4, 1981).



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

49. The ESA's Section 10 incidental take provision, added by congressional amendment in 1982, corroborated FWS's definition of "harm" and confirmed Congress's intent for "take" to encompass more than just deliberate and intentional impacts. The provision allows the Services to issue permits for takings that are "incidental to, and not the purpose of," otherwise lawful activities—a framework that assumes and depends upon the idea that the ESA's prohibition against takings extends to those that are not deliberate or intentional. 16 U.S.C. § 1539(a)(1). When amending the statute, rather than reverse or weaken the prohibition on "harm" as defined by FWS, Congress leveraged and built upon it. Indeed, the legislative history from 1982 states plainly that "harm," as used in the "take" definition, "may occur as a result of habitat modification." S. Rep. No. 97-418, at 26 (1982).

50. The Supreme Court upheld FWS's definition of "harm" in 1995 in *Sweet Home.* The Court based its determination on a careful examination of the statutory text and structure, legislative history, and post-enactment congressional action, all of which it found to support the definition. *Sweet Home*, 515 U.S. at 695. After engaging in this in-depth review, the *Sweet Home* Court upheld the "harm" definition as a reasonable interpretation of the statute, using the then-prevailing administrative law standard first articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).

51. When considering the plain text of the ESA, the *Sweet Home* Court was guided by the "ordinary understanding of the word 'harm'" and the need to give "harm" independent meaning in addition to the other verbs in the "take" definition. 515 U.S. at 697–98. The legislative history of the statute reinforced this plain language interpretation with its emphasis on take being "defined in the broadest possible terms" and not limited to intentional behaviors. *Id.* at 704–05.



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

52. The *Sweet Home* Court also found that the 1982 ESA amendment adding the Section 10 incidental take permitting provision supported FWS's definition of "harm." *Id.* at 707. The Court pointed to evidence that "Congress had habitat modification directly in mind" when it added the incidental take provision: "Both the Senate Report and the House Conference Report" treated as a model for the new permitting process a case in which development threatened incidental harm to an endangered butterfly through modification of its habitat. *Id.*

53. In addition to upholding FWS's interpretation of "harm," the *Sweet Home* Court rejected the interpretation—articulated by the dissent and the Court of Appeals in the opinion below—that "harm" was limited to activities associated with hunting and deliberate killing. The Court rejected that interpretation based on "three errors": a flawed premise, disregard for contradictory statutory text, and misapplication of an interpretive canon (*noscitur a sociis*). *Id.* at 701–02. In this portion of the *Sweet Home* opinion, the Court did not invoke *Chevron* but rather described the logical errors and legal flaws that rendered the dissent's interpretation (which the Services have now adopted) inconsistent with the statute.

V. THE PROPOSED RULE

54. On April 17, 2025, the Services published a proposal to rescind the longstanding regulatory definition of "harm" under the ESA (the "Proposed Rule"). *See* Rescinding the Definition of "Harm" Under the Endangered Species Act, 90 Fed. Reg. 16102 (Apr. 17, 2025). In attempting to justify this abrupt departure from a half-century of consistent agency practice that the Supreme Court had explicitly approved, the Services asserted that they were "compelled" to take this action by the Supreme Court's holding in *Loper Bright Enterprises v. Raimondo* and the "take Care" clause of the U.S. Constitution. *Id*. at 16103–04.



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

55. *Loper Bright* is a 2024 Supreme Court decision that overruled the *Chevron* doctrine, which prescribed judicial deference to reasonable agency interpretations of ambiguous statutory language. The *Loper Bright* Court found that, under the APA, "'the reviewing court'—not the agency whose action it reviews—is to 'decide *all* relevant questions of law' and 'interpret . . . statutory provisions.'" 603 U.S. at 398 (quoting 5 U.S.C. § 706). Courts are not "somehow relieved of [their] obligation to independently interpret" ambiguous statutes, because, the *Loper Bright* Court reasoned, even those ambiguous statutes "must" have "a single, best meaning." *Id.* at 400. Even so, the Court emphasized that the holdings of earlier cases upholding agency actions under *Chevron* "are still subject to statutory *stare decisis* despite our change in interpretive methodology." *Id.* at 412. And, notwithstanding its overruling of *Chevron*, the *Loper Bright* Court acknowledged that "respect" for agency interpretations of statutes remained "especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Id.* at 386.

56. Addressing this judicial precedent, the Proposed Rule stated that the longstanding "harm" definition was upheld by the Supreme Court in *Sweet Home* "under *Chevron* deference." 90 Fed. Reg. at 16103. The Services then erroneously claimed that *Loper Bright* now forced them to rescind the regulatory definition of harm and effectuate what they considered "the single, best meaning of the statute." *Id.*

57. To the contrary, *Loper Bright* did not require federal agencies to discard longstanding interpretations upheld by the Supreme Court under the *Chevron* framework based on a sudden about-face in an agency's preferred statutory interpretation. In fact, the *Loper Bright* Court did the opposite, reaffirming that judges, not "political actors" of the Executive Branch, should resolve statutory ambiguities. 603 U.S. at 403–04. As *Loper Bright* explained, the



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

*Chevron* doctrine was unworkable in large part because it required political actors to interpret statutes—such that statutory interpretation could turn on "individual policy preferences"—whereas "resolution of statutory ambiguities involves legal interpretation," a task best left to the courts. *Id.* at 399–400, 403–04.

58. The Proposed Rule proffered the very sort of politicized Executive Branch statutory interpretation that *Loper Bright* rejected, premised upon the Services' sudden reversal as to the "single, best meaning" of "take" within the ESA. Specifically, the Services adopted the interpretation of "take" from the *Sweet Home* dissent. *See* 90 Fed. Reg. at 16103. That rejected interpretation claimed that a historical understanding of the term "take" (and, therefore, the concepts it comprised, including "harm") meant "to reduce those animals, by killing or capturing, to human control," and "take" must require an "affirmative act[] . . . directed immediately and intentionally against a particular animal." *Id.* The Services did not explain how or why the *Sweet Home* dissent, not the majority, supplied the "single, best" meaning of "take," or why a purported historic definition of "take" should override the definition that Congress supplied.

59. The Services acknowledged *Loper Bright*'s admonition that cases previously decided under *Chevron*, including *Sweet Home*, "are still subject to statutory *stare decisis*." *See id*. However, the Services suggested that the Proposed Rule was exempt from statutory *stare decisis* because *Sweet Home* did not determine that the regulatory definition at issue was "the only possible . . . reading" of the statute. *Id.* The Services failed to acknowledge that the focus of the *Chevron* doctrine was not to declare the only possible reading of the statute, but only to determine whether the agency's interpretation was a reasonable one.



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

60. The Services did not propose to codify any different definition to replace the longstanding definition of "harm," asserting that there was no need because the ESA itself defined "take." *Id.* The Services further stated that elaborating on one term within the statutory definition of "take" was "unnecessary in light of the comprehensive statutory definition." *Id.*

61. However, even absent a replacement definition, the Services explained that, under their new statutory interpretation, "harm" and the larger concept of "take" did not include "actions that impair the habitat of protected species." *Id.*

62. The Services did not articulate any scientific rationale for the Proposed Rule, nor did they cite any scientific research in support of it.

63. Regarding NEPA compliance, the Services claimed that the Proposed Rule was a "nondiscretionary action" and as such was exempt from NEPA review under 42 U.S.C. § 4336(a)(4), which waives NEPA's environmental review requirements for nondiscretionary actions as to which an agency "does not have authority to take environmental factors into consideration." *Id.* at 16104. In the alternative, the Services claimed that the Proposed Rule qualified for a categorical exclusion under NEPA because, if finalized, the action would allegedly have "no significant individual or cumulative effect on the quality of the human environment." *Id.* at 16104–05. No matter the theory, the Services did not describe or evaluate the environmental impacts of the Proposed Rule.

64. Regarding ESA Section 7 consultation compliance, the Services claimed that the Proposed Rule did not require such consultation. *See id.* at 16105. They asserted that "the plain language, structure, and purposes of the ESA" reflect that "Congress never intended to place a consultation obligation on the Services' promulgation of implementing regulations under the Act." *Id.*



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

65. The Proposed Rule received approximately 358,000 public comments. Those comments overwhelmingly opposed the Federal Defendants' proposed regulatory change.

66. Scientists, environmental and community-based non-profit organizations, Tribal Nations, and other entities representing diverse interests submitted comments in opposition to the Proposed Rule. Many of these commenters presented the large body of scientific information demonstrating that habitat protection is central to the survival and recovery of listed species, explained why the Services' asserted legal bases for the rule were invalid, and demonstrated that the Services needed to subject the Proposed Rule to full NEPA review as well as ESA Section 7 consultation.

67. Many Tribes submitted comments in opposition to the Proposed Rule, presenting scientific, legal, and cultural arguments against repeal of the harm definition, as well as alleging breach of obligations of the federal government to sovereign Tribal Nations.

68. Many States submitted comments in opposition to the Proposed Rule. Among other arguments, a number of States expressed that, if finalized, the Proposed Rule would undermine their substantial reliance interests in the longstanding regulatory definition of harm. Absent a federal commitment to treat destruction of listed species' habitat as "take" under the ESA, these States asserted that they would face significant financial, administrative, and regulatory burdens to fill the gap in protection of listed species created by the Rescission.

69. Other commenters also answered the Services' call for comments specific to "reliance interests" in the longstanding "harm" definition. *See id.* at 16103–04. For example, a national trade association representing ecological restoration investment firms explained that, if finalized, the Proposed Rule would effectively strand nearly half a billion dollars' worth of



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

investments in conservation outcomes made in reliance on the longstanding regulatory definition of harm.

## VI. THE RESCISSION

70. On July 10, 2026, the Services finalized their rule to rescind the regulatory definition of "harm," carrying forward the flaws in the Proposed Rule. *See* 91 Fed. Reg. 43300 (July 14, 2026).

71. The Services offered only a brief rationale for the Rescission, repeatedly neglecting or disregarding factors that should have been central to their decision-making. In response to commenters' concerns about scientific evidence, reliance interests, impacts on states and tribes, and regulatory confusion, the Services asserted that rescinding the longstanding and Supreme Court-approved definition of "harm" was nondiscretionary, and in some instances altogether denied the legitimacy of commenters' interests.

72. The Services contended that the action was "nondiscretionary" because the prior definition of "harm" did not match their new position on the best reading of the statute. *See id.* at 43307. Although the Services cited *Loper Bright*, which tasks *reviewing courts* with determining a statute's best reading, *see, e.g.*, *id*. at 43301, they cited no authority that compels an *agency* to promulgate a rule when it changes its statutory interpretation. Instead, the Services suggested that FWS acted disingenuously when initially defining "harm" in 1975—a definition that no administration has questioned since that year, other than a minor clarification in 1981. *See id.* at 43300–01. Nor did the Services reconcile their "nondiscretionary" characterization with their professed exercise of judgment when disregarding alternatives to the Rescission and commenters' descriptions of reliance interests in the longstanding definition. *See id.* at 43306.



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

73. While the Services claimed to be "effectuat[ing] the Executive Branch's obligation to 'take Care that the Laws be faithfully executed,' U.S. Const. art. II, section 3," they did not explain how replacing a definition that the Supreme Court upheld with one that the Court rejected fulfilled that obligation. *See, e.g.*, *id.* at 43307.

74. The Services did not acknowledge the public comments containing extensive scientific evidence that the Rescission would negatively affect protected species. The Services attempted to deflect questions about the Rescission's effects by pointing to other sections of the ESA that address habitat conservation in specific, limited circumstances. *See id.* at 43306. At times, the Services recognized that the Rescission would significantly reduce habitat protection measures, *see id.* at 43304, but they omitted any discussion of impacts on protected species. The Services cited no scientific evidence that the Rescission would be beneficial or even neutral for preventing extinction or promoting recovery.

75. The Services summarily concluded that any reliance interests in the longstanding definition of "harm" are "outweighed by the constitutional interest in repealing" it. *Id. at* 43308. While claiming to acknowledge the presence of reliance interests, the Services dismissed relevant comments by asserting that they merely described illegitimate or extraneous factors. For example, the Services depicted commenters with economic interests in the prior definition of "harm," including nearly a half-billion dollars in habitat conservation investments, as engaged in "essentially rent-seeking" "cast in the form of reliance interests." *Id.* at 43308–09. The Services concluded that state governments' reliance on the definition of "harm" as part of larger conservation frameworks, as well as private individuals' interests in ecological stability, "are really policy disagreements." *Id.* at 43309.



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

76. The Services did not prepare an Environmental Impact Statement or an Environmental Assessment for the Rescission. The Services claimed that the Rescission is "a nondiscretionary action with respect to which [they do] not have authority to take environmental factors into consideration." *Id.* at 43316 (quoting 42 U.S.C. § 4336(a)(4)). Alternatively, they applied a categorical exclusion covering actions "that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case," and that extraordinary circumstances do not apply. *Id.* (quoting 43 C.F.R. § 46.210(i)).

77. The Services did not engage in ESA Section 7 consultation on the Rescission, claiming that they "are acting solely in their role as administrators of the ESA" and the consultation requirements of Section 7(a)(2) do not apply. *Id.*

VII. IMPACTS OF THE RESCISSION

A. Imminent Illegal Habitat Destruction

78. The rescission of the harm definition will have an immediate effect on pending biological opinions (following ESA Section 7 consultation) for federal projects and incidental take permit applications for non-federal projects where take is anticipated and directly caused by habitat destruction or degradation.

79. For example, the Forest Service is currently in the middle of an amendment process for the Northwest Forest Plan, which governs management of 17 national forests across 24.5 million acres in Washington, Oregon, and northern California and conserves multiple federally listed species that rely on the region's mature and old-growth forest habitat to survive. Proposed changes in 2025 included increased logging in habitat for the threatened northern



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

spotted owl and marbled murrelet, and the Forest Service has announced it will propose further changes, including to the protections currently given to northern spotted owls' prey species, in the fall of 2026.

80. The Forest Service has acknowledged that it will need to consult with FWS and NMFS under ESA Section 7 on the amendment to the Northwest Forest Plan, but after the Rescission, that consultation and subsequent biological opinion is likely to result in inadequate habitat protections for the northern spotted owl and marbled murrelet, as well as threatened and endangered salmon, steelhead, and trout, which will in turn allow actions that increase extinction threats to those species.

81. In another example, the Rescission will upend the finalization of the draft Bush Prairie Habitat Conservation Plan ("HCP"), being developed by the City of Tumwater and the Port of Olympia, Washington. The draft HCP specifies that the take of ESA-listed species resulting from these activities largely falls under the regulatory definition of harm, and it creates prairie and wetland reserves to mitigate for habitat destruction. The Services' rescission of the regulatory harm definition will undermine the draft Bush Prairie HCP's measures intended to preserve habitat on which the Olympia pocket gopher, streaked horned lark, Oregon vesper sparrow, and Oregon spotted frog rely.

B. Regulatory Confusion

82. The Rescission also sows confusion across the regulated community by signaling that, after fifty years of regulatory certainty, the Services will no longer require incidental take permits for any modification or degradation of listed species' habitat, or otherwise treat modification or destruction of habitat as "take" under the ESA—despite the requirement to the contrary in the text of the ESA. Omission of permitting for habitat-related takings will mean,



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

among other things, that the Services will no longer require entities whose proposed actions threaten such takings to comply with the regulatory process to avoid and reduce the resulting impacts on listed species, including by preparing conservation plans that minimize and mitigate the impacts of the incidental take "to the maximum extent practicable." 16 U.S.C. § 1539(a)(2)(B).

83. Similarly, the Rescission indicates that the Services themselves will no longer treat modification or degradation of listed species' habitat as "take" when preparing Biological Opinions through the Section 7(a)(2) consultation process. Omission of such treatment will mean, among other things, that the Services will no longer prescribe reasonable and prudent measures or alternatives to minimize the impact of habitat-related takings or the terms and conditions necessary to implement such measures. *See id.* § 1536(b)(4)(C)(ii), (iv).

84. The Rescission also sows confusion across the regulated community about habitat protection measures in existing habitat conservation plans with incidental take permits and existing biological opinions with incidental take statements. In the Rescission, the Services state that "permits or incidental take statements finalized prior to the effective date of this rule will not be required to be reevaluated under this final rule." 91 Fed. Reg. at 43302. If the Services will no longer require incidental take permits or statements for modification or degradation of listed species' habitat, or otherwise treat modification or destruction of habitat as "take" under the ESA, that stance will throw the continuing legal validity of existing take permits and consultations into question. Members of the regulated community could well decide they no longer need to abide by the terms of existing take permits and statements, including implementation of conservation measures.



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

85. The Rescission also signals that the Services will not be monitoring or enforcing obligations imposed by those permits/statements. In fact, the Rescission invites take permit holders to return permits they no longer need where "the permittee is mitigating only for habitat impacts that were considered prohibited as take when their permit was issued." *Id.* at 43305.

86. In addition, because the Rescission leads members of the regulated community to erroneously believe that habitat destruction no longer constitutes "take," they may destroy listed species' habitat in reliance on the Rescission and cause severe harm to endangered and threatened species.

FIRST CLAIM FOR RELIEF

Violation of the Endangered Species Act and the Administrative Procedure Act: Contrary to Law and Failure of Rational Decisionmaking

87. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

88. The ESA prohibits "take," including "harm" that encompasses substantial impacts to imperiled species from habitat modification or degradation. 16 U.S.C. §§ 1532(19), 1539(a)(1)(B).

89. Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

90. When promulgating a rule, the Services must articulate a satisfactory explanation for their action, including a rational connection between the facts found and the choice made. A regulation is arbitrary and capricious under the APA where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

91. An agency changing course must show "that the new policy is permissible under the statute [and] that there are good reasons for it." *Fed. Commc'ns Comm'n v. Fox Television Stations*, 556 U.S. 502, 515 (2009). "An agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *State Farm*, 463 U.S. at 30.

92. Federal Defendants failed to rationally justify the Rescission. The Services adopted the ESA statutory interpretation advanced by a dissenting opinion in *Sweet Home*, notwithstanding that the *Sweet Home* majority rejected that very interpretation as inconsistent with the statutory text, structure, and legislative history. The *Sweet Home* Court upheld FWS's "harm" definition as reasonable and consistent with the statute; it also unequivocally rejected the interpretation proffered by the lower court, the dissent, and now the Services. The *Sweet Home* Court ultimately stated that it "need not decide whether the statutory definition of 'take' compels [FWS's] interpretation of 'harm'" because it upheld FWS's definition under *Chevron*. 515 U.S. at 703. Nevertheless, the Services in the Rescission had no basis for choosing—among all possible statutory interpretations—the one interpretation that the Supreme Court had already rebuffed.

93. In addition, in the Rescission, Federal Defendants purported to apply the Supreme Court's *Loper Bright* precedent but actually issued an Executive Branch interpretation informed by political policy considerations—the very type of interpretation methodology that *Loper Bright*



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

rejected when it overruled *Chevron*. Moreover, while purporting to acknowledge *Loper Bright*'s affirmance of statutory *stare decisis* principles for cases decided under *Chevron*, Federal Defendants nullified those principles by limiting them to anomalous circumstances: a reviewing court previously would have had to make contradictory determinations that a statute was sufficiently ambiguous to trigger *Chevron* deference *and* that the agency's interpretation was "the only possible . . . reading." 91 Fed. Reg. at 43301. Further, Federal Defendants entirely failed to consider *Loper Bright*'s instruction that "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." 603 U.S. at 394.

94. The Services' finalization of the Rescission is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the ESA and the APA, 5 U.S.C. § 706(2)(A).

SECOND CLAIM FOR RELIEF

Violation of the National Environmental Policy Act and the Administrative Procedure Act: Failure To Prepare an Environmental Impact Statement/Environmental Assessment and Invalid Invocation of Categorical Exclusion

95. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

96. NEPA requires an agency undertaking a "major Federal action[] significantly affecting the quality of the human environment" to prepare a "detailed statement" on the environmental impacts of its action and reasonable alternatives. 42 U.S.C. §§ 4332(2)(C), 4336(b)(1). Even where an agency's undertaking "does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

unknown," the agency must evaluate the impact of its action in an environmental assessment. *Id.* § 4336(b)(2).

97. The Rescission renounced a longstanding, statutorily grounded interpretation of the ESA that protected endangered species from habitat destruction resulting in injury or death, and the Rescission indicated that the Services would henceforward exclude that protection from their implementation and enforcement of the Act. The Services' action "has a reasonably foreseeable significant effect on the quality of the human environment." *Id.* § 4336(b)(1).

98. Nevertheless, the Services failed to evaluate the Rescission in an environmental impact statement. Nor did they address the Rescission in an environmental assessment.

99. The Services wrongly asserted that the Rescission is "a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration" and therefore exempt from NEPA. *Id.* § 4336(a)(4). The Rescission is discretionary, and the Services' contention that the ESA compels the Rescission is unfounded. Even if, for the sake of argument, the Services had properly interpreted the ESA, they failed to evaluate alternatives to the Rescission as required by NEPA, including abiding by statutory *stare decisis* principles as discussed in *Loper Bright*.

100. The Services are also wrong in asserting that the Rescission qualifies for a categorical exclusion from NEPA analysis. The Services attempted to invoke a categorical exclusion reserved for "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." 43 C.F.R. § 46.210(i); NOAA NEPA Guidance at App'x E, E-14. However, the Rescission will have concrete impacts



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

on listed species and is not of a merely "administrative, financial, legal, technical, or procedural nature." The effects of the Rescission are not too broad, speculative, or conjectural to analyze and, regardless, there is no indication that the effects will later be subject to the NEPA process. In fact, they will not be. The Services' referenced categorical exclusion—and all other categorical exclusions—are inapplicable.

101. Moreover, the Rescission presents extraordinary circumstances that prohibit the use of any categorical exclusion. For example, the Department of the Interior (which includes FWS) has determined that extraordinary circumstances exist for actions that "[h]ave significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species." 43 C.F.R. § 46.215(g). NMFS has described extraordinary circumstances as including "adverse effects on species or habitats protected by the ESA." NOAA NEPA Guidance at 9. The effects of the Rescission on species currently—and proposed to be—listed and protected under the ESA are significant and adverse. Other extraordinary circumstances that apply to the Rescission are highly controversial environmental effects, highly uncertain and potentially significant environmental effects, and precedential effect for future actions. *See* 43 C.F.R. § 46.215; NOAA NEPA Guidance at 9. Each of those extraordinary circumstances would be independently sufficient to prohibit the Services' reliance on a categorical exclusion.

102. The Services' evasion of NEPA under an invalid claim of nondiscretionary action; their improper invocation of a categorical exclusion; their failure to recognize extraordinary circumstances that prevent use of a categorical exclusion; and their failure to prepare an environmental impact statement or even an environmental assessment that examines



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

the effects of the Rescission and a reasonable range of alternatives violated NEPA and the APA, 5 U.S.C. § 706(2).

THIRD CLAIM FOR RELIEF

Violation of the Endangered Species Act and the Administrative Procedure Act:
Failure to Consult Under ESA § 7

103. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

104. Section 7(a)(2) of the ESA requires that each federal agency, in consultation with FWS and/or NMFS, ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any threatened or endangered species or result in the destruction or adverse modification of critical habitat of such species. 16 U.S.C. § 1536(a)(2). Action is defined to include the promulgation of regulations; actions that may directly or indirectly cause modifications to the land, water, or air; and actions that are intended to conserve listed species or their habitat. 50 C.F.R. § 402.02.

105. If a federal agency, including FWS or NMFS itself, determines that its proposed action "may affect" listed species or critical habitat, the agency must engage in such Section 7(a)(2) consultation with FWS and/or NMFS, depending on the species involved. *Id.* § 402.14(a). The "may affect" hurdle is easily met, encompassing any possible effect, whether beneficial, benign, adverse, or of an undetermined character. *See California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018–19 (9th Cir. 2009).

106. Unless the agency determines, with concurrence from the relevant Service, that its proposed action "is not likely to adversely affect any listed species or critical habitat," formal consultation is required. 50 C.F.R. §.402.14(a), (b)(1). Formal consultation concludes with the



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

preparation of a biological opinion by FWS and/or NMFS addressing whether the proposed action will jeopardize threatened or endangered species or result in the destruction or adverse modification of critical habitat, and setting forth any necessary measures for avoiding, minimizing, and mitigating any adverse impacts. 16 U.S.C. § 1536(b). An action agency may avoid formal consultation by engaging in "informal consultation" with FWS and/or NMFS and obtaining a written concurrence that the project is not likely to adversely affect threatened or endangered species or critical habitat. 50 C.F.R. §§ 402.13(a), 402.14(b)(1).

107. The Services have acknowledged that their own actions are subject to internal consultation with the FWS Endangered Species Office or NMFS Office of Protected Resources. *See* Endangered Species Consultation Handbook 1-5 to 1-6, App. E (1998).

108. The Rescission marks a dramatic shift in the Services' regulatory approach that will have significant impacts on listed species and critical habitat, but the Services did not conduct any Section 7 consultation on the Rescission. Instead, without pointing to anything specific about the statute, they asserted that, based on "the plain language, structure, and purposes of the ESA," consultation requirements do not apply to the Services' promulgation of ESA implementing regulations. 91 Fed. Reg. at 43316. To the contrary, the plain language, structure, and purposes of the ESA required that the Services comply with Section 7 in promulgating the Rescission.

109. For these reasons, the Services' failure to consult on the Rescission under ESA Section 7 was arbitrary, capricious, contrary to the ESA, and in violation of the APA, 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:



*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

A. Declare that the Services violated the ESA, NEPA, and the APA when they issued the Rescission;

B. Vacate the Rescission;

C. Reinstate the harm rules previously set forth at 50 C.F.R. §§ 17.3 and 222.102;

D. Enjoin FWS and NMFS from applying the Rescission and require them to apply, utilize, and follow the harm rules previously in force;

E. Grant such restraining orders and/or preliminary and permanent injunctive relief as Plaintiffs may request to ensure that threatened and endangered species and their habitat do not suffer irreparable harm pending resolution of the merits of this action;

F. Award Plaintiffs their reasonable fees, expenses, costs, and disbursements, including attorneys' fees associated with this litigation under the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(4), and the Equal Access to Justice Act, 28 U.S.C. § 2412.

G. Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 14th day of September, 2026.

*s/ Kristen L. Boyles*
Kristen L. Boyles (WA Bar No. 23806)
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T: (206) 343-7340
kboyles@earthjustice.org

*s/ Benjamin M. Levitan*
Benjamin M. Levitan (NY Bar No. 5215058)
(*pro hac vice*)
Earthjustice
48 Wall Street, Floor 15
New York, NY 10005
T: (202) 797-4317

blevitan@earthjustice.org

*s/ Sharmeen Morrison*
Sharmeen Morrison (CA Bar No. 360435)
(*pro hac vice*)
Earthjustice
180 Steuart Street #194330
San Francisco, CA 94105
T: (415) 217-2005
smorrison@earthjustice.org

*s/ Timothy J. Preso*
Timothy J. Preso (MT Bar No. 5255)
(*pro hac vice*)
Earthjustice
P.O. Box 4743
Bozeman, MT 59772-4743
T: (406) 586-9699
tpreso@earthjustice.org

*Attorneys for all Plaintiffs*

*s/ Erica A. Fuller*
Erica A. Fuller (MA Bar No. 669647)
(*pro hac vice*)
Conservation Law Foundation
62 Summer St.
Boston, MA 02110
T: (508) 400-9080
efuller@clf.org

*Attorney for Plaintiff Conservation Law Foundation*

*s/ Brian Segee*
Brian Segee (CA Bar No. 200795)
(*pro hac vice*)
Center for Biological Diversity
226 W. Ojai Ave., Suite 101-442
Ojai, CA 93023
T: (805) 750-8852
bsegee@biologicaldiversity.org

*Attorney for Plaintiff Center for Biological Diversity*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served via first-class mail upon the following:

TODD BLANCHE
Acting U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

DOUGLAS BURGUM
Secretary of the Interior
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

KEVIN LILLY
Principal Deputy Assistant Secretary
U.S. Fish and Wildlife Service
1849 C Street, N.W.
Washington, DC 20240

HOWARD LUTNICK
Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Ave N.W.
Washington, DC 20230

NOAA FISHERIES
1315 East-West Highway
Silver Spring, MD 20910

TIMOTHY R. PETTY
Assistant Secretary of Commerce for Oceans and Atmosphere,
Deputy NOAA Administrator
National Oceanic and Atmospheric Administration
1401 Constitution Avenue NW
Room 5128
Washington, DC 20230

U.S. FISH AND WILDLIFE SERVICE
1849 C Street, N.W.
Washington, DC 20240

CIVIL PROCESS CLERK
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271

Jessica Hann



EARTHJUSTICE
810 3rd Ave #610
SEATTLE, WA 98104
(206) 343-7340